## City Court.

### *Trial Term—March,* 1886.

## BRIDGET E. NELLIGAN *against* NEW YORK TYPOGRAPHICAL UNION No. 6.

The action was brought to recover the sum of $150, death benefits, under the constitution and by-laws of the defendant. The defense was that the intestate was not in "good standing" under the by-laws, because his dues were not paid promptly at the time therein specified for the payment, although it was admitted that at the time of the death of the member nothing was owing by him to the defendant, the deceased having in his lifetime paid all his dues. It was also claimed that as the charter of the defendant limited the funeral benefits to one hundred dollars, it was *ultra vires*·for the corporation to agree in its constitution and by-laws to pay any sum in excess thereof.

*Held,* that a by-law forfeiting the funeral benefit in case a member's dues, although fully satisfied, are not paid at the precise time required by the lodge, is unreasonable, illegal and void, and no bar to a recovery.

That the amount of benefits must be limited to that authorized by the charter, and cannot exceed the sum therein fixed notwithstanding the by-laws provide for a much larger one.

*Jacobs Bros.*, for plaintiffs.

*John R. O'Donnell*, for defendant.

McADAM, Ch. J.—The contention is that in order to make the defendants liable for the benefits promised in and by article XI., section 1 of its constitution, the

deceased must not only have been a member of the defendant's Union for one year immediately preceding death, but must have been "continuously in good standing" for six months immediately preceding thereto as well—that, having failed to pay his dues for May and June, 1885, on or before the first day of the next succeeding month, as required by article X., section 1, of the constitution he "lost his good standing in the Union," and did not therefore come within the meaning of article XI., providing for the payment of death benefits to the families of deceased members "continuously in good standing for six months immediately preceding death." In other words, that although the subsequent receipt of his dues left the member in good standing for the ordinary business purposes of membership, the failure to pay in time operated as a forfeiture of his "good standing" in case of claim by the family for death benefits. The language of the articles cited (X. and XI.) gives plausibility to this contention, and leads to the inquiry whether such a provision for forfeiture made by a corporation is legally binding upon its members, and whether its effect in case of death is to deprive the family of the promised benefits. The question is not new, for it has more than once received judicial consideration, and all this court is required to do is to follow the determination reached in those cases after intelligent argument and deliberation. In Gunlach *v.* Germania Mechanics' Association (4 *Hun*, 341), the court said: "The constitution and by-laws of a benevolent society should have a liberal interpretation for the purpose of promoting the general objects of the society," which are benevolence and charity.

But the by-laws of a corporation to be valid must be consistent with the charter, and must not be unreasonable (*Field on Corp.* § 296; *Angell & A. on Corp.* §§ 345–352). The charter authorizes the defendant to provide by contribution a sum not to exceed $100 to defray funeral expenses, and the defendant under its charter and

by-laws should, to the extent of $100, make the expenditure good. The intestate was a member of the Union, he had paid his dues, and the Union accepted the sums delivered as in payment and adjustment of them. This court in Bueking v. Robert Blum Lodge, 1 *City Ct. R.* 51, following Carten v. Father Mathew U. B. Soc., 3 *Daly*, 20, held that "the governing rule with regard to corporations is that their by-laws must be reasonable, and all those which are vexatious, unequal, oppressive or manifestly detrimental to the interests of the corporation or its members are void," and concluded by holding that a by-law like the present, operating as a forfeiture of benefits, after the corporation had accepted all the dues in arrear, was inoperative as a forfeiture, and that the beneficiary was entitled to recover. These decisions are based on sound grounds of public policy, and find ample warrant and support in the law. There is no reason why the Union after taking the dues from their deceased brother should decline to give him proper burial, simply because he was a little behind time in making the agreed payments. The mantle of charity should be thrown over his shortcomings, and the fact that he was not on hand the very day appointed to pay his month's dues, but paid them shortly afterward, should not deprive him of the last sad rites of burial, which a fraternal spirit of brotherhood should suggest, and which a court, on the contract contained in the by-laws liberally and legally interpreted, must require. Corporations are creatures of the statute, and must conform to the law of their creation, and their by-laws must harmonize with the laws of the land, as interpreted by the courts, and if they transcend these they are to that extent void—as much so as if the illegal portions of them had never been enacted. The general scheme of benevolence holds good, but the illegal condition is eliminated from it. Disregarding, as the courts do, the illegal forfeiture, it follows that after receiving the member's due in full, the delinquent member is restored

to "good standing," not for business advantages only, but for all the fraternal and benevolent purposes of the order, and the legal portion of the contract as to death benefits is enforceable by the plaintiffs as the family of the deceased member, and the designated beneficiaries, under the plan provided for relief benefits. The obligation, however, is only enforceable to the extent of $100—the sum designated in the charter—the organic law of the order, the spirit which called it into being and gave it legal life and existence. The promise to pay $150 is commendable and generous, but is in conflict with the limitation imposed by the charter. Whether the doctrine of *ultra vires* could be enforced against a stranger so as to defeat the agreement as to the amount contained in the contract, need not be considered (see 22 *N. Y.* 264, 269, 506; 7 *Wend.* 31; 97 *N. Y.* 381); for I hold that it may be enforced against the legal representative of a member, who as such, is, according to legal principles, chargeable with a knowledge of what the charter, the organic law, contains.

Upon this ground, the plaintiffs' recovery must be limited to the amount permitted to be paid by the charter, viz.: $100. This interpretation as to the extent of the defendant's liability is certainly one of which they cannot complain, because it merely enforces the contract obligation of the defendant construed with reference to the charter under which it works (see 97 *N. Y.* 381; 4 *Hun*, 339).

Returning again to the subject of forfeitures which take from members and their families pecuniary rights and remedies, it is proper to remark that forfeitures are frequently relieved against and seldom enforced. The law, in its endeavor to deal out justice, looks to the substance of the contract, and opposes subtle technicalities which stand in the way of doing what is regarded as the fair even thing between man and man. The punishment should fit the crime, and not go beyond it. Technical

offenses are not to be treated like high crimes and misdemeanors, nor is a technical violation of a by-law, atoned for by the member and condoned by the society, to lower the status of a delinquent brother, who in his lifetime did everything required to make good the delinquency, and to restore himself to good fellowship in the order among those respected by him as craftsmen and friends in his chosen walk of life.

The law takes this charitable and rational view of such things; and if this just mode of interpretation is to be applied to any class of contracts, I know of none to which they can be more appropriately applied than to those contained in the by-laws of benevolent societies, whose watchwords are typical of faith, hope and charity, and in which the mantle of death should command silence over the grave of a dead brother whose only offense was a few days' delay in paying a monthly stipend of fifty cents.

This short delay in payment, caused, perhaps, by impecuniosity or illness, worked no hardship to the Union nor to any of the brothers composing it.

The Union may say, if this is so, how are we to enforce discipline? This question is easily answered: by suspending the delinquent brother from benefits during his delinquency, and if that continues too long, expel him from the order, and all duties owing from one to the other cease.

But if he pays his arrearages and the order receives his money it cannot call him an unworthy brother, nor can it deprive him of the rights which follow membership, and a by-law which deprives him or his family of benefits thereafter for the technical prior default, fully atoned for and satisfied, is in the nature of confiscation, and is so inequitable and unreasonable that no court of justice can put upon it the seal of approval.

The delinquency is trivial, the punishment absolute forfeiture or confiscation. Apply the rule to property mat-

ters and the impracticability of such a by-law, is apparent. If a property owner does not pay his taxes at the appointed time he may be charged interest upon the default, and his lands may be ultimately sold ; but would any one contend that a law providing for "absolute forfeiture" of the entire property for the technical failure to pay on the very day named would be a reasonable exercise of legislative authority ?   I think not.

This would be called confiscation—a right only exercised in time of war, as a military necessity, and as a means of punishing and subduing an enemy or those in sympathy with the belligerent power.

Except when exercised as a war measure courts would intervene and protect rights of property from legislation so unjust and far-reaching. Rights must be reasonably respected, not arbitrarily destroyed.

The Typographical Union is a corporation and a law-making power, so far as the regulation of its internal affairs is concerned. It may make by-laws, with this limitation, that they must be reasonable and not oppressive. If it promises charity, it must give it without regard to technical defaults afterwards waived and satisfied by being made good.

The officers of the defendant in refusing payment acted conscientiously and according to the letter of their by-law, but the broad provision as to absolute forfeiture being, for the reasons aforesaid, void, no longer excuses them for withholding from the family of their dead brother the burial sum which forms one of the many commendable features of their organization.

Upon the entire case, therefore, I find and decide that the plaintiffs are entitled to judgment for $100 and interest, making together $100.80, with costs.

### The Law of Mutual Associations.

Mutual Benefit Associations are rapidly increasing. The law governing them is becoming settled by legal decisions. In settling the

Nelligan *v.* New York Typographical Union No. 6.

rights of. interested parties in these associations, the courts consider them as representing life insurance companies, and have uniformly treated them as such in substance (*May on Ins.* 2 ed. § 550 a ; Dennett *v.* Kink, 59 *N. Y.* 10 ; Commonwealth *v.* Wetherbee, 105 *Mass.* 149).

The Illinois statute is very broad, and includes as beneficiaries, " widows, orphans, heirs or relatives by consanguinity or affinity, devises or legatees of deceased members" (1 *Starr & Curt. Stat.* 1348. § 122). This statute is broad enough to include strangers as beneficiaries in the persons of devisees and legatees. In Ohio the statute provides " for the mutual protection and relief of its members, and for the payment of stipulated sums of money to the families or heirs of deceased members." Under this provision, the Ohio benefit associations cannot issue certificates of membership payable to the named beneficiary or " assigns" (State *v.* Association, 13 *Week. L. Bull.* 354). And if a member make a bequest of the proceeds of his certificate of membership to a stranger, it does not constitute such beneficiary an " heir" of the testator, and such certificate is void (National Mut. Aid Assoc. *v.* Gonser, 13 *Week. L. Bull.* 445 ; State *v.* Moore, 38 *Ohio St.* 7 ; State *v.* Standard Life Asso., 38 *Id.* 281 ; State *v.* Cont. O. Mut. Bal. Assoc., 29 *Id.* 399 ; State *v.* People's Mut. Ben. Asso., 42 *Id.* 579). It was held in Ohio that a contract by a benefit association " to pay in case of a member's death to ' himself or assigns,' ' to his estate,' ' to his executors or administrators,' or to any person, whether a relative or not, who is not of his family or heirs, is against public policy and void (State *v.* Standard L. Asso., *supra*). A class of beneficiaries cannot be created who are not contemplated nor authorized by the charter of an association (State *v.* People's Mut. Ben. Asso., *supra*).

The Illinois charter seems to contemplate strangers as a class of beneficiaries, and the question arises, can a member make a stranger beneficiary in his certificate of membership ? The Illinois benefit associations have answered this in the affirmative, by issuing such certificates and paying a stranger the proceeds on the death of a member.

The charter of the Knights of Honor provides that " any brother may cause to be entered upon the reporter's record book a direction to whom his benefit shall be paid." Under this it has been decided that a member may give the fund to any one he pleases, whether wife, relative or stranger (Highland *v.* Highland, 13 *Brad.* 510).

The member can change his beneficiary, but in making a change he must be controlled by the regulations of the association (Kentucky Mut. Masonic Ins. Co. *v.* Miller's Adm., 13 *Bush*, 494).

When the certificate of membership designates as payees the " legal representatives," the fund becomes assets in the hands of the execu-

tor, and can be used to pay debts of the deceased member (People v. Phelps, 78 Ill. 148). If this would divert the fund into a channel not contemplated by the charter, the certificate would be void (State v. Standard Life Ins. Asso., supra).

The amount of the certificate must be paid to the beneficiary and not to the deceased member's personal representatives as assets (Highland v. Highland, 109 Ill. 366 ; Richmond v. Johnson, 28 Minn. 447 ; Redmen v. Clendenin, 44 Ind. 429).

Members have made changes of the beneficiary, as from daughter to wife (Swift v. Conductors' Asso., 96 Ill. 309) ; from a lawful wife to a putative wife (Durian v. Central Verein, 7 Daly, 168) ; from a wife to a daughter (Tenn. Lodge v. Ladd, 5 Lea, 716).

But in making a change of the beneficiary, the substituted person must be of a class designated by the charter or prescribed by the by-laws (Greeno v. Greeno, 23 Hun, 478 ; McClure v. Johnson, 56 Iowa, 620).

When the charter makes the object of the fund to be for families or relatives, a stranger cannot be made a beneficiary (Van Bibber v. Van Bibber [Ky.]; 14 Ins. Law J. 290). So when the charter provides that the fund shall go to the "legal heirs or beneficiaries" of the member, a stranger cannot be a beneficiary (Weisert v. Muehl, 81 Ky. 336). When the certificate of membership makes the fund payable to "the widow or heirs" it does not go into the deceased member's estate in the hands of the executor, but directly to the widow or heirs (People v. Phelps, supra).

The member cannot change the beneficiary by will, where the charter provides a different way (Stephenson v. Stephenson, 64 Iowa, 534 ; Duvall v. Goodson, 79 Ky. 224 ; Arthur v. Benevo. Asso., 29 Ohio St. 557). It is a general principle, that the rules and regulations of a benefit association must be strictly followed in changing a beneficiary (Aid Asso. v. Lupold, 101 Pa. St. 111 ; Hellenberg v. I. O. B. B., 94 N. Y. 580).

The beneficiary has no vested interest in the fund until the assured dies (Splawn v. Chew, 60 Texas, 532 ; Aid Society v. Lewis, 6 Mo. App. 412 ; Richmond v. Johnson, 28 Minn. 447). If the certificate is void, without fraud on the part of the applicant, and the company has run no risk for indemnity of the insured, the membership fee and assessments should be returned to the applicant (Connecticut Mut. L. Ins. Co. v. Pyle, 4 N. E. Rep. 465 ; S. C., 15 Ins. Law J. 261). But if the policy is void ab initio, and there has been no fraud, the premium must be returned (Tyrie v. Fletcher, Cowp. 666, 668 ; Delavigne v. United Ins. Co., 1 Johns. Cas. 310 ; Anderson v. Thornton, 8 Exch. Rep. 425 ; May on Ins. § 4). When the certificate is void, the prin-

ciple of estoppel does not apply to the company (National Mut. Aid Ass. v. Gonser, *supra*).

The Illinois statute, in stating what are not insurance companies, says : "Associations and societies which are intended to benefit the widows, orphans, heirs and devisees of deceased members,    .    .    . and where no annual dues or premiums are required,    .    .    . shall not be deemed insurance companies" (1 *Starr & C. Stat.* 620, § 31).

The Illinois supreme court defines an annual assessment as follows: "An annual assessment, as we understand the term, would require the payment of a specified sum each year" (Commercial League v. People, 90 *Ill.* 166). Under this definition, many of the benefit associations of Illinois are assessing "annual dues," which is in violation of their charter. It has been decided that assessments authorized by the by-laws "not to exceed $20 in any one year to meet expenses of the association," are not annual dues (Com. League v. People, *supra*). But in this case there was not any sum certain, nor was the assessment to be made annually. The assessment was contingent. But if a company does make annual assessments, it lies with the State to correct the wrong, and not with the members. Nobody but the State can oust the association of its franchises.

In making assessments the companies generally send out the notices once a month, giving thirty days' notice stating that the certificate of membership will become forfeited if the amount is not paid within thirty days from date of notice. But it must be remembered that this means thirty days from the day following the receipt, at the member's post-office, of the notice, and not thirty days from the mailing of the notice at the home office (Protection Life Ins. Co. v. Palmer, 81 *Ill.* 88). So if the amount of the assessment is mailed within the thirty days to the home office, the certificate can not be forfeited on non-payment of assessment within thirty days. These associations can introduce new rules which are binding upon the members, inasmuch as the right of membership depends upon paying the assessments as called for, and each payment of assessments is equivalent to a new contract for insurance.—*Chicago Legal News*, April 24, 1886.

See also 22 *Cent. L. J.* 560.

## Construction of Clauses Designating Beneficiary.

The certificate read : "all payments or benefits that may accrue or become due to the heirs of the person insured, by virtue of this policy, will be payable to Mrs. H. M. Case or lawful heirs."

At the time the certificate was issued to Case, he had a wife living by the name of Amelia M. Case, and a daughter by the name of Inez H. Case. The wife Amelia M. died September 12, 1878, and on Febru-

ary 3, 1882, the insured remarried Emma Case, and on May 59, 1885, he died leaving her surviving. *Held*, that Amelia M. Case was the person intended by the designation, Mrs. H. M. Case, upon the certificate; that upon her death the designation lapsed as to her; and that the lawful heir of Case, his daughter Inez, became the person entitled to the beneficiary (Day *v.* Case, 43 *Hun*, 179).

### Failure to Receive Certificate.

The plaintiff's intestate died without receiving the certificate provided for by the defendant's by-law. *Held*, that the lack of the certificate was fatal to a recovery (Bishop *v.* Grand Lodge, 43 *Hun*, 472).

### By-laws must be Reasonable.

The supreme court of Pennsylvania, in Lynn *v.* Vreemansburgh, B. A. (54 *Phila. Legal Intel.* 462), per GREEN, J., in speaking of a by-law imposing a fine on certain members, said.: "That it is unreasonable, extortionate, and oppressive to the last degree, must be at once conceded. If the monthly penalty were a hundred per cent. instead of ten, it would be only a difference in degree, not in character. Of course, if there is an unlimited right to impose, by means of a by-law, any amount of fine or penalty which the association may please to ordain, and the law is powerless to interfere, the results must be accepted, no matter how unjust or oppressive they may be. But we do not so understand the law upon this subject." And the court held : "The general rule that by-laws of corporations must be reasonable and must not be oppressive, on peril of invalidity, is such a familiar doctrine that a citation of authorities in support of it is unnecessary.

In *Endlich on Building Associations*, at § 271, it is said : 'And all by-laws to be binding must be in conformity [1] with existing and supreme laws . . ; [2] with the charter, its letter and spirit; [3] with reason and equity " (*Ang. & A. on Corp.* § 347). The same rule exists as to ordinances of municipal governments, as was held in Kneeler *v.* Borough of Norristown (4 *Out.* 368). For the reasons we have stated, we hold that the by-law of the plaintiff imposing ten per cent. penalty in question is unreasonable and oppressive, and therefore invalid and of no effect."

### Unincorporated Societies.

A different rule applies to unincorporated societies (see 1 *City Ct. R.* 123).

### The Common Pleas limits its previous Decision as to the Binding effect of By-laws.

In Skelly *v.* Coachmen's B. & C. Society (13 *Daly*, 2), the court holds that a by-law of an incorporated benevolent society, although

unreasonable, and therefore void, as against members not assenting to it may be valid and binding as a contract by assenting members. Chief Justice DALY, in writing the opinion, says : "Although entertaining some doubt as to the correctness of the decision in Curtan *v.* Father Matthew T. A. B. Society (3 *Daly*, 22), I do not feel at liberty to disturb it."

### Members Seceding from Lodge.

Members who voluntarily seceded from a lodge, and since refused to pay dues, premiums, or contributions thereto, have forfeited their endowment certificates or policies issued by it to each member, and all claim upon the fund by which payment of such certificates or policies was protected or secured.

Individuals who have left an incorporated society and formed a voluntary one, leave all rights and funds of the corporation, and cannot maintain a suit to recover the corporate funds, while the corporation remains entire and in full possession of all its rights (Goodman *v.* Jedediah Lodge, No. 7, Ind. Order of B'Nai Brith, 8 *Cent. Rep.* No. 3).